**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LINN ENERGY, LLC, *et al.*,[1] | ) | Case No. 16-60040 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES, (B) CONTINUE ORDINARY COURSE INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR MAY 13, 2016, AT 11:30 A.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TX, 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number are as follows: Linn Energy, LLC (7591); Berry Petroleum Company, LLC (9387); LinnCo, LLC (6623); Linn Acquisition Company, LLC (4791); Linn Energy Finance Corp. (5453); Linn Energy Holdings, LLC (6517); Linn Exploration & Production Michigan LLC (0738); Linn Exploration Midcontinent, LLC (3143); Linn Midstream, LLC (9707); Linn Midwest Energy LLC (1712); Linn Operating, Inc. (3530); Mid-Continent I, LLC (1812); Mid-Continent II, LLC (1869); Mid-Continent Holdings I, LLC (1686); Mid-Continent Holdings II, LLC (7129). The Debtors' principal offices are located at JPMorgan Chase Tower, 600 Travis, Suite 5100, Houston, Texas 77002.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

## Relief Requested

1. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, (ii) continue ordinary course incentive programs for non-insiders, and (iii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background[2]

3. The Debtors operate an independent oil and natural gas business with approximately 1,650 employees. Headquartered in Houston, Texas, as of year-end 2015, the Debtors had approximately 27,000 gross productive wells in the United States, including in

2 The facts and circumstances supporting this Motion are set forth in the *Declaration of Arden L. Walker, Jr. in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

California, Colorado, Illinois, Kansas, Louisiana, Michigan, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming. The Debtors have approximately $7.7 billion of funded debt, comprised of approximately $1.7 billion of funded debt at Debtor Berry Petroleum Company, LLC ("Berry") and approximately $6 billion of funded debt at Debtor Linn Energy, LLC ("LINN") and its direct and indirect Debtor subsidiaries other than Berry and Linn Acquisition Company, LLC (collectively, the "LINN Debtors").

4. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

**The Debtors' Workforce**

5. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts will be jeopardized.

6. The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not

permitted to continue paying their compensation, providing benefits, and maintaining existing rank-and-file incentive programs. Consequently, the relief requested herein is necessary and appropriate.

7. The Debtors employ approximately 1,650 individuals on a full-time basis (the "Employees"). Approximately 920 Employees are paid on an hourly basis and approximately 730 Employees receive a salary. The Debtors also employ 2 Employees on a part-time basis. None of the Employees are represented by a union or collective bargaining unit. In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Staff") from several staffing agencies (collectively, the "Staffing Agencies") to fulfill certain duties on a short-term basis. The Debtors currently retain approximately 145 Independent Contractors and Temporary Staff in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

## Employee Compensation and Benefits

8. To minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability

coverage, employee assistance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

9. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

10. The Debtors estimate that they owe prepetition amounts of the Employee and Compensation and Benefits in approximately the following amounts:

| Relief Sought | Approximate Amount Outstanding |
|---|---|
| **Compensation and Withholding Obligations** | |
| Unpaid Wages | $5,650,000[3] |
| Unpaid Contractor and Staffing Obligations | $1,825,000 |
| Student Employment Programs | $88,500 |
| Payroll Processing | $66,000 |
| Expense Reimbursements | $25,000 |
| **Ordinary Course Incentive Programs** | |
| Good Catch Plan | $2,000 |
| Spot Bonuses | $4,000 |
| **Employee Benefit Programs** | |
| Health Insurance Programs | $3,110,000 |
| Life and AD&D Insurance | $40,000 |
| Disability Benefits | $15,000 |
| Workers' Compensation Program | 0 |
| 401(k) Plan | $275,000 |
| Paid Leave | 0 |
| Severance | 0 |
| Supplemental Benefits | $60,000 |
| **Postpetition Non-Employee Director Compensation** | 0 |
| **Total** | **$11,160,500** |

[3] This amount includes $2.5 million on account of accrued Unpaid Withholding Obligations, as discussed in greater detail below.

11. The Debtors do not believe there are amounts owed to any individuals on account of the Employee Compensation and Benefits that exceed $12,850, the priority expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.[4]

**I. Compensation and Withholding Obligations.**

**A. Unpaid Wages.**

12. The Debtors pay Employees' wages, salaries, and other compensation on a biweekly basis (collectively, the "Employee Compensation"). The Debtors pay their Employees' wage and salary obligations (the "Wages") on either a salaried or hourly basis, and pay approximately $6,580,000 in the aggregate on a biweekly basis. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

13. As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $5,650,000 on account of accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to the 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages"), substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of

[4] Certain Employees in all tiers of the Debtors' organizational structure may be entitled to Compensation and Benefits that exceed the statutory cap on account of accrued vacation, as discussed in greater detail below. None of these amounts (certain of which are required by law in various states) are currently due, but instead would only be due if such Employees are terminated or resign.

business and consistent with past practice, and to continue paying Wages to their Employees on a postpetition basis in the ordinary course of the Debtors' business.

**B. Independent Contractors and Temporary Staff Compensation.**

14. The Debtors rely on Independent Contractors and Temporary Staff in the ordinary course of their business; there are currently approximately 145 such Independent Contractors and Temporary Staff, though that number does fluctuate based on current needs. These Independent Contractors and Temporary Staff perform a wide range of services critical to the Debtors' operations, including, among other things, providing drilling, engineering, and other operational services, information technology services, and various other administrative functions. The Debtors' Employees rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' businesses and Temporary Staff to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and the Staffing Agencies is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors spend approximately $1,350,000 on Independent Contractors and Temporary Workers on a monthly basis (the "Unpaid Contractor and Staffing Obligations"). As of the Petition Date, the Debtors estimate that the aggregate amount of Unpaid Contractor and Staffing Obligations is approximately $1,825,000. The Debtors seek authority to pay any Unpaid Contractor and Staffing Obligations owed on account of services already rendered, and to continue paying Independent Contractors and Staffing Obligations on a postpetition basis in the ordinary course of the Debtors' business.

**C. Student Employment Programs.**

15. The Debtors also have certain programs pursuant to which they rely on other non-Employees, namely local high school and college students (collectively, the "Student

Employment Programs"). One Student Employment Program is with Cristo Rey Jesuit High School in Houston, pursuant to which Cristo Rey students in a work-study program provide services to the Debtors at their headquarters, and pursuant to which the Debtors pay Cristo Rey approximately $8,500 per month. The second Student Employment Program is the Debtors' summer internship program, pursuant to which 16 college students will be temporarily employed by the Debtors for approximately ten weeks. That program starts on May 15; however, the Debtors entered into contracts with the students around April 6, and incurred obligations to pay relocation and other related expenses in the amount of $5,000 per student. The Debtors seek authority to pay any obligations owed on account of the Student Employment Programs, and to continue such programs on a postpetition basis in the ordinary course of the Debtors' business.

**D. Withholding Obligations.**

16. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients. On a biweekly basis, the Debtors deduct approximately $780,000 in the aggregate from Employees' paychecks on account of the Deductions.

17. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the

"Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. On a biweekly basis, the Debtors remit approximately $2,165,000 in the aggregate on account of the Payroll Taxes.

18. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $2,500,000, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

**E. Payroll Processing.**

19. The Debtors contract with Automatic Data Processing, Inc. ("ADP"), a third-party payroll service, to process and administer their payroll and reimbursements. Each biweekly pay-period, the Debtors calculate the Employee Compensation for each Employee and transfer funds sufficient to satisfy such obligations to ADP in advance of each applicable pay period. ADP distributes the Employee Compensation to the Employees on behalf of the Debtors.

20. On average, the Debtors pay approximately $45,000 per month to ADP for the payroll-related services that it provides to the Debtors and related administrative costs (the "Payroll Fees"). As of the Petition Date, approximately $66,000 has accrued and remains unpaid on account of Payroll Fees. Failure to pay the Payroll Fees in the future could lead to delayed disbursement of Employee Compensation and related benefits to the appropriate Employees to the detriment of the Employees and the Debtors' operations. As a result, the Debtors seek to pay any unpaid Payroll Fees that have accrued prior to the Petition Date and to

continue administering payroll in the ordinary course of business consistent with the Debtors' historical practices.

**F. Reimbursable Expenses.**

**1. Expense Reimbursements.**

21. In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties.[5] The Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse the Expense Reimbursements would likely impose significant hardship on Employees.

22. On average, the Debtors pay Expense Reimbursements of approximately $65,000 per month in the aggregate. Due to the timing of when Employees submit expense reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding at this time. Based on historical practice, however, the Debtors estimate that approximately $25,000 in Expense Reimbursements have accrued but remain unpaid. The Debtors seek authority to pay the Employees' unpaid prepetition Expense Reimbursements and to continue paying the Expense Reimbursements in the ordinary course of the Debtors' business.

5 The Debtors also maintain specific programs for relocation costs and continuing professional education. Such programs are discussed in greater detail below.

## II. Non-Employee Director Compensation.

23. The Debtors maintain a board of directors consisting of five non-Employees and the Debtors' Chief Executive Officer (each, a "Director"). The non-Employee Directors are paid annual retainers, certain attendance and other fees, and are entitled to expense reimbursement for out-of-pocket expenses (the "Director Compensation").[6] In 2015 and 2016, the Debtors have paid approximately $1.5 million in Director Compensation. As of the Petition Date, the Debtors believe that no amounts are outstanding in respect of the Director Compensation. By this Motion, the Debtors request to pay any de minimis amounts that may be outstanding with respect to Director Compensation (e.g., open expense reimbursements) and to continue paying amounts arising under the Director Compensation in the ordinary course of business consistent with historical practice.

## III. Non-Insider Ordinary Course Incentive Plans.

24. The Debtors have four employee incentive plans. Each of these bonus programs is an integral part of the Debtors' Employee Compensation and Benefits. The first program is a general incentive plan, which applies to all Employees. The second program is an award program, which applies to a specific subset of "mission-critical" employees. Due to the large scale of those programs, the Debtors will file a separate motion seeking approval of those programs later in these chapter 11 cases after proper notice and the appointment of an official committee of unsecured creditors (if any). That motion will be devoted exclusively to describing those programs more fully and the criticalness to the Debtors and their stakeholders of

---

6 Directors are also part of the Debtors' target bonus plan, but the Debtors are not seeking approval of that plan by this Motion. As discussed more fully herein, the Debtors will instead request approval for that plan by separate motion upon proper notice after appointment of any official committees in these chapter 11 cases.

continuing those programs postpetition. As such, the Debtors do not seek the Court's approval of those programs by this Motion.

25. Rather, by this Motion, the Debtors are seeking authority to continue their two other incentive plans—the Spot Bonuses and the Good Catch Program (each as defined herein and together, the "Employee Incentive Programs")—and to honor their related prepetition obligations to non-insider Employees thereunder. Each bonus program, including the Employee Incentive Programs, is an important component of overall Employee compensation and generates substantial value to the Debtors' estates because they align the Employees' incentives with those of the Debtors and encourage the Employees to achieve goals beneficial to the business as a whole.

**A. Spot Bonuses.**

26. The Debtors provide a short-term incentive program (the "Spot Bonuses") across the Debtors' enterprise. More specifically, the Debtors' middle-management Employees, in a supervisory role, have discretion to issue individual bonuses to Employees whose performance goes beyond expectations and exemplifies model behavior. For example, an Employee may receive a Spot Bonus for showing initiative by developing a comprehensive financial dataset for a discrete project above and beyond the Employee's stated duties. The Spot Bonuses align the Employees' incentives with those of the Debtors and their stakeholders by emphasizing workplace performance that goes above and beyond the Debtors' expectations.

27. On average, the Debtors pay approximately $10,000 per month on account of the Spot Bonuses in the ordinary course of business. Because the Spot Bonuses are awarded based on ongoing performance where an Employee goes above and beyond performance expectations, the performance invariably takes into account efforts that took place before the Petition Date. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Spot

Bonuses is approximately $2,000. By this Motion and out of an abundance of caution, the Debtors seek authority to honor Spot Bonuses based on the prepetition period and to continue the Spot Bonuses in the ordinary course of business on a postpetition basis consistent with historical practice.

**B. Good Catch Bonuses.**

28. The Debtors provide a short-term incentive program for members of the Debtors' field operations team (the "Good Catch Program"). The Good Catch Program provides incentives that are payable monthly, following the first payroll of the month, as a percentage of base salary and are on-the-spot bonuses issued to individual Employees for excellent performance in adhering to the Debtors' established safety guidelines. For example, an Employee may receive an award for taking note of an issue with oil leakage and facilitating the resolution of the issue. The Good Catch Program aligns the Employees' incentives with those of the Debtors and their stakeholders by emphasizing safety in the Debtors' oil and gas extraction and production operations, which is of the utmost importance to the Debtors.

29. On average, the Debtors pay approximately $2,000 per month on account of the Good Catch Program in the ordinary course of business. Because the Good Catch Program is awarded based on ongoing performance and safety guidelines, the Good Catch Program invariably takes into account efforts that took place before the Petition Date. By this Motion and out of an abundance of caution, the Debtors seek authority to honor the Good Catch Program based on the prepetition period and to continue the Good Catch Program in the ordinary course of business on a postpetition basis consistent with historical practice.

## IV. Employee Benefit Programs.

### A. Health and Welfare Programs.

30. The Debtors offer a comprehensive employee benefits package to all of their full-time Employees for medical, dental, and vision care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including:

- health care coverage;
- life insurance;
- disability benefits;
- workers' compensation; and
- the 401(k) Plan (as defined herein).

31. The Debtors seek authority to pay any unpaid amounts due under the Health and Welfare Programs, which they estimate total approximately $3,440,000 in the aggregate, and to continue the Health and Welfare Programs postpetition in the ordinary course.

#### 1. Health Insurance Programs.

32. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, the FSA, the Dental Plans, and the Vision Plan (each as defined below, and collectively, the "Health Insurance Programs").

33. The Debtors offer medical and prescription drug benefit coverage (collectively, the "Medical Plan") to Employees, which is administered by BlueCross BlueShield of Texas ("BCBSTX"), a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, and CareMarkPCS Health LLC ("CareMark"). Because the Medical Plan is self-insured, the Debtors are primarily responsible for Employee claims under the Medical Plan. In addition, the Debtors pay BCBSTX a monthly administrative service fee and also pay CareMark a per-prescription administrative service fee for administration of payments and

benefits under the Medical Plan. Generally, the medical and prescription drug coverage provided under the Medical Plan depends on a variety of factors, including whether the coverage is sought for an individual or a family, or whether treatment is sought "in-network," meaning at a provider that contracts with BCBSTX, or whether the coverage provided is "out-of-network." Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. Prescription coverage is provided to all Employees who enroll in the Medical Plan, although Employee out-of-pocket costs may vary depending on whether prescriptions are fulfilled through "in-network" or "out-of-network" providers. The Debtors pay approximately $2,130,000 per month on account of the Medical Plan, inclusive of costs and fees for CareMark's prescription coverage.[7] The Debtors also contract for stop-loss coverage with Symetra Life Insurance Company ("Symetra"), under which the Debtors pay approximately $65,000 per month to insure against Medical Plan claims which exceed $300,000 per covered individual. As of the Petition Date, the Debtors estimate that approximately $23,000 is accrued and unpaid with respect to amounts owed to Symetra.

34. The Debtors also provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Debtors are currently paying COBRA premiums for 75 former Employees whose employment with the Debtors terminated prior to the Petition Date, in connection with which the Debtors pay a monthly administration fee of approximately $1,750. The Debtors estimate they offset amounts arising with respect to COBRA fees and claims with approximately $34,000 per month in

---

[7] Employee contributions to the Medical Plan are covered by the Deductions, as discussed above.

premiums collected by CONEXIS Benefit Administrators L.P. ("CONEXIS"). The Debtors will continue offsetting COBRA premiums on a postpetition basis in the ordinary course of business during the pendency of these chapter 11 cases unless otherwise ordered by the Court.

35. The Debtors also provide Employees who participate in the Medical Plan with access to a flexible spending account (the "FSA"), administered by CONEXIS, which can be used to cover incidental medical costs and dependent child care. Currently, approximately 465 Employees use the FSA for medical costs or dependent child care, for which the Debtors pay a monthly administration fee of approximately $2,800. The Debtors do not make any contributions to any Employee's FSA. As of the Petition Date, the Debtors believe that there are no amounts outstanding with respect to administrative costs related to the FSA.

36. The Debtors also provide Employees with dental insurance (the "Dental Plans") and vision insurance (the "Vision Plan"), each administered by Connecticut General Life Insurance Company. The Dental Plans and Vision Plan are self-insured, and the Debtors pay an administrative service fee each month. The total cost of the Dental Plans and Vision Plan is approximately $140,000 and $20,000 each month, respectively.

37. The Debtors pay approximately $2,300,000 per month in total costs associated with the Health Insurance Programs. As of the Petition Date, the Debtors estimate that approximately $3,110,000 has accrued and remains unpaid on account of the Health Insurance Programs, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Health Insurance Programs and to continue administering the Health Insurance Programs in the ordinary course of business and consistent with past practice.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

38. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Standard Life and AD&D Insurance") to Employees through Liberty Life Assurance Company of Boston ("Liberty"), which provides maximum coverage of up to twice the applicable Employee's annual salary in the event of an Employee's death or injury, up to a maximum of $500,000. Employees may also purchase supplemental life insurance (the "Voluntary Life Insurance," and together with the Standard Life and AD&D Insurance, the "Life and AD&D Insurance") through Liberty, which provides maximum coverage of up to $500,000 for the applicable Employee, and in other varying amounts for such Employee's spouse and children.[8] The Debtors are fully insured through the Life and AD&D Insurance and the Debtors pay approximately $95,000 per month with respect to their portion of the premiums for the Life and AD&D Insurance.

39. As of the Petition Date, the Debtors estimate that approximately $40,000 has accrued and remains unpaid with respect to the Life and AD&D Insurance. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Life and AD&D Insurance and to continue administering the Life and AD&D Insurance in the ordinary course of business and consistent with past practice.

---

8 Employees may purchase Voluntary Life Insurance for spouses up to $100,000 and for children up to $10,000.

**b. Disability Benefits.**

40. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits on the first day of the month following their date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 100 percent of their base wages for the first 12 weeks, and then 80 percent for the next 14 weeks, in the event of a qualified non-work related illness or injury (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their monthly wages and applicable bonus payments, up to a monthly maximum of $15,000, in the event of a qualified non-work related illness or injury (the "Long-Term Disability Benefits").

41. An Employee's Short-Term Disability Benefits begin on the next work day after an Employee is absent from work due to injury and after seven consecutive work days of absence due to illness. The Short-Term Disability Benefits continue for a maximum of 26 weeks of any disability thereafter. The Long-Term Disability Benefits begin after an Employee is absent from work for 26 weeks due to any disability and continue until normal Social Security retirement age. The Short-Term Disability Benefits are self-insured by the Debtors, and the Long-Term Disability Benefits are fully insured through Liberty. The Debtors pay Liberty approximately $33,000 per month in premiums with respect to the Long-Term Disability Benefits.

42. Twenty-eight (28) Employees are currently receiving the Disability Benefits. As of the Petition Date, the Debtors estimate that approximately $15,000 has accrued and remains unpaid on account of the Debtors' obligations with respect to the Disability Benefits and associated premiums, substantially all of which will become due and payable within the first 21 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Disability Benefits and to continue

providing the Disability Benefits in the ordinary course of business and consistent with past practice.

**c. Workers' Compensation Program.**

43. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). All Employees are entitled to participate in the Debtors' Workers' Compensation Program.

44. Currently, the Debtors maintain coverage under the Workers' Compensation Program for Employees in states other than Wyoming through Starr Indemnity & Liability Co. ("Starr").[9] The Debtors most recent two insurance carriers were Zurich American Insurance ("Zurich") and Liberty Mutual Insurance Group ("Liberty"). In any given year, the Debtors pay deductibles to its current insurance carrier on account of workers' compensation claims as well as to previous carriers should any claims remain open with those carriers. As such, the Debtors may pay deductibles on account of workers' compensation claims to Starr, Zurich, and Liberty in 2016.

45. Premiums are paid annually and depend substantially on the Debtors' payroll, the Debtors' risk profile (claims history), and the Employee's specific position. The Debtors paid approximately $501,000 and $432,000 in premiums for 2014 and 2015, respectively, on account of the coverage provided by Zurich.[10] The coverage is subject to a per-claim deductible in the amount of $250,000, and the Debtors paid approximately $404,000 and $376,000 for 2014 and 2015, respectively, on account of such deductibles. The Debtors also pay additional premiums

[9] For Employees who work in New Mexico, the Debtors pay an additional $4.30 per Employee per quarter to the New Mexico Taxation and Revenue Department, which totals $111.80 per quarter and $447.20 per year.

[10] The Debtors also made payments to Liberty in 2014 and 2015 on account of prior claims that remained open.

for audits associated with the Workers' Compensation Program and the claims asserted against the program, for which the Debtors paid approximately $63,000 and $66,000 for 2014 and 2015, respectively.

46. Coverage under the Workers' Compensation Program for Employees in Wyoming is maintained through the Wyoming Department of Workforce Services, for which the Debtors pay approximately $58,000 each year in the aggregate (the "State Workers' Compensation Fees"). The Debtors make payments on account of the State Workers' Compensation Fees on a quarterly basis. The Debtors do not yet know the precise amounts that will be owed on account of the State Workers' Compensation Fees until such time as the next quarterly assessment is received from the state, which is expected to occur on or around the end of June.

47. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[11] There are currently approximately 10 open claims under the Workers' Compensation Program to which this would apply. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the Workers' Compensation Program during these chapter 11 cases. In addition, to the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under

11 The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

48. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process. Thus, the Debtors request the authority to (a) pay the Unpaid State Workers' Compensation Fees, if any, (b) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including by paying all State Workers' Compensation Fees, and (c) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

**3. 401(k) Plan.**

49. The Debtors provide all Employees with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). Employees are generally eligible to participate in the 401(k) Plan upon the date of hire, unless the Employee is employed part-time, in which case the Employee must complete 1,000 hours of service to be eligible to participate in the 401(k) Plan. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). As of the Petition Date, the Debtors estimate that they will be obligated to remit approximately $452,000 on account of the 401(k) Deductions.

50. The Debtors match the Employees' 401(k) Plan contributions on a discretionary, dollar-for-dollar basis up to six percent of the Employees' compensation (collectively, the "401(k) Contributions"). The Debtors contribute approximately $642,000 per month on

account of the 401(k) Contributions. As of the Petition Date, approximately $275,000 in 401(k) Contributions has accrued and remains unpaid.

51. The 401(k) Plan is currently administered by Great-West Financial Retirement Plan Services, LLC d/b/a Empower ("Empower"). The 401(k) Plan currently incurs annual costs associated with Empower's administration of the 401(k) Plan (the "401(k) Administrative Fees"), but such costs are borne directly by the trust established by the 401(k) Plan and thus the Debtors are not directly responsible for such amounts.

52. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions. As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates. Therefore, the Debtors request the authority to (a) pay the 401(k) Contributions consistent with their ordinary course practice, and (b) transfer the 401(k) Deductions on a pre- or postpetition basis and to continue the 401(k) Plan in the ordinary course of business on a postpetition basis.

**B. Paid Leave.**

53. The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for Holidays, Vacation, Sick Leave, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

54. In the ordinary course of business, the Debtors provide vacation hours ("Vacation") to the Employees as a Paid Leave benefit. Vacation accrues, beginning with the first full pay period of employment, at a specified rate based on the Employee's years of service. Employees accrue between approximately three and nine hours of Vacation each pay period.

Employees may carry over up to 80 hours of their accrued but unused Vacation into the next calendar year at the end of any calendar year, except for Employees in California, which allows for a carry-over of all unused Vacation each year. Employees who are terminated or resign are entitled to a cash payment in lieu of their accrued but unused Vacation, subject to deduction for any amounts owed to the Debtors. The Debtors estimate that, as of April 30, 2016, the aggregate amount of accrued but unpaid Vacation is approximately $4.9 million. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused Vacation in the event an Employee leaves the Debtors' employment. In addition, the Debtors also offer Employees 10 paid holidays throughout the year (each a "Holiday"). Generally, eligible Employees are not required to work on a designated Holiday and are paid for Holiday time at 150 percent of their base rate of pay to the extent such Employee does work on a Holiday.

55. In the ordinary course of business, the Debtors provide sick-time leave hours ("Sick Leave") to the Employees as a Paid Leave benefit. Full-time Employees are allotted either 30 or 40 hours of Sick Leave for each calendar year, depending on whether the applicable full-time Employee works between 30 and 39 hours a week or 40 hours a week or more. Sick Leave may be used for personal illness, wellness and healthcare appointments, and for similar leave for an Employee's immediate family member. Employees may carry over up to 40 hours of their accrued but unused Sick Leave into the next calendar year, with a maximum accrual of 80 hours on record at any given time. Employees who are terminated or resign are not entitled to a cash payment in lieu of the accrued but unused Sick Leave, and if Sick Leave is exhausted for any reason, the applicable Employee must use Vacation in its place.

56. The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, leave provided under the Family and Medical Leave Act, voting, military leave, and all legally required leaves, including, but not limited to, crime victim and victim of domestic violence leave, volunteer firefighter leave, and leave for visits with children's teachers and school administrators, where applicable (collectively, the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

57. The Debtors believe that the continuation of the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. As a result, the Debtors seek authority to allow eligible Employees to use their Paid Leave in the ordinary course of business on a postpetition basis, and to pay any Vacation accrued in the ordinary course of business. To be clear, the Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**C. Severance.**

58. In the ordinary course of business, the Debtors provide severance benefits to non-insider Employees in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns[12] (the "Non-Insider

[12] Pursuant to the Debtors' Severance Plan, if an Employee resigns for "Good Reason," he or she may be entitled to Severance. "Good Reason" means any of the following to which the Employee will not consent in writing: "(a) a reduction in the [Employee's] base salary; (b) any material reduction in the [Employee's] title, authority or responsibilities; or (c) relocation of the [Employee's] primary place of employment to a location

Severance Program").[13] Under the Non-Insider Severance Program,[14] Employees receive, upon termination, a lump-sum payment determined by the Employee's seniority. A brief breakdown follows:

1. *"**Tier 2" Employees*** (Vice President-level or equivalent) — Payment shall equal one times his or her base salary[15] plus a pro-rata target bonus.[16]

2. *"**Tier 3" Employees*** (Director-level or equivalent) — Payment shall equal nine months of base salary plus a pro-rata target bonus.

3. *"**Tier 4" Employees*** (Manager-level or equivalent) — Payment shall equal six months of base salary plus a pro-rata target bonus.

4. *"**Tier 5" Employees*** (Supervisor-level or equivalent) — Payment shall equal four and a half months of base salary plus a pro-rata target bonus.

5. *"**Tier 6" Employees*** (Any Employee not assigned to another Tier) — Payment shall equal three months of base salary plus a pro-rata target bonus.

59. Under the Non-Insider Severance Program, qualifying terminations also entitle the applicable Employees to COBRA benefits, depending on the specific "Tier" in which the Employee falls (the "Non-Insider Severance Benefits"). The Non-Insider Severance Program also entitles Employees to receive three months of outplacement services through Lee Hecht

more than 50 miles from the Employer's location."

13 For the avoidance of doubt, "insiders" of the Debtors (as that term is defined in section 101(31) of the Bankruptcy Code) are excluded from the relief requested herein. To the extent the Debtors propose to make a severance payment to, or implement a severance program for, any potential insiders, the Debtors will seek separate approval from the Court with respect to such payments or programs.

14 The Debtors believe that none of the Tier 2 through Tier 6 Employees are "insiders" of the Debtors for purposes of section 503(c) of the Bankruptcy Code. To wit, none of the Tier 2 through Tier 6 Employees (a) were appointed or elected by the Debtors' board of directors, (b) routinely report to the Debtors' board of the directors, (c) hold a position that is provided for or created by the governing corporate documents of the Debtors, nor (d) hold the title of "officer" with respect to the Debtors.

15 Base salary is an Employee's regular weekly or hourly rate of pay and does not include overtime or any other type of compensation.

16 For the avoidance of doubt, the Debtors are not seeking approval of the target bonus program by this Motion and will file a separate motion seeking approval of that program later in these chapter 11 cases.

Harrison. The cost of this service is $1,350 per Employee. While not every Employee who is terminated opts to take advantage of this benefit, the Debtors estimate that they will spend approximately $80,000 on account of outplacement services over the next two months.

60. The Debtors believe that the Non-Insider Severance Program has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. Furthermore, as a condition to receiving Non-Insider Severance Benefits, the Debtors typically require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider Severance Program will help reduce the time and expense that could arise in the absence of the Non-Insider Severance Program to defend the assertion of claims by any severed Employees.

61. The Debtors spent approximately $2.7 million in the aggregate on account of the Non-Insider Severance Program for January, February, March, and April 2016. As of the Petition Date, the Debtors estimate that there are no unpaid obligations under the Non-Insider Severance Program. The Debtors seek to pay any prepetition amounts and to continue the Non-Insider Severance Program in the ordinary course of business and consistent with historical practice. For the avoidance of doubt, the Debtors are only seeking authority to continue the Non-Insider Severance Program, and will exercise their discretion as to which Employees receive benefits under such program.

**V. Supplemental Employee Benefits.**

62. The Debtors offer supplemental employee benefits (collectively, the "Supplemental Benefits") to substantially all of their full-time Employees, including:

- educational assistance;

- matching gifts program;
- adoption assistance.
- relocation assistance; and
- referral bonuses.

63. The Debtors seek authority to pay any unpaid amounts due under the Supplemental Benefits, which they estimate total approximately $60,000 in the aggregate, and to continue the Supplemental Benefits postpetition in the ordinary course of business.

**1. Educational Assistance.**

64. The Debtors encourage their Employees to pursue professional growth through continuing education opportunities. The Debtors thus offer all full-time Employees a reimbursement for tuition and related expenses that are incurred in furtherance of the applicable Employee's professional academic development (the "Education Assistance Program"). Pursuant to the Education Assistance Program, the Debtors will reimburse Employees up to 100 percent of the tuition, fees, and books associated with the successful completion of an approved course, up to $5,250 per calendar year. Successful completion of a course means that the Employee has passed the course with a grade of "C" or better, or its equivalent—a grade of "A" or better will entitle the applicable Employee to full reimbursement, whereas a grade of "B" or "C" will entitle such Employee to partial reimbursement. In the aggregate, the Debtors pay eligible Employees approximately $17,000 per month on account of reimbursements under this program. The Debtors believe that Employees' continued education and refinement of their skillset is valuable and ultimately contributes to the Debtors' business as a whole.

65. As of the Petition Date, approximately $6,000 in the aggregate is accrued and unpaid on account of the Education Assistance Program, substantially all of which will become due and payable within 21 days of the commencement of these chapter 11 cases.

**2. Matching Gifts Program.**

66. The Debtors will match certain Employee contributions to charitable, non-profit organizations through an Employee-giving campaign (the "Matching Gifts Program"). Provided that the specified charity meets certain requirements, the Debtors will make a dollar-for-dollar donation to the specified non-profit organization to match an Employee's contribution to such organization. The Debtors believe that, as a major employer in their operating regions, it is important for the Debtors to maintain continued goodwill with local organizations and their Employees. The Debtors thus respectfully request authority to continue the Matching Gifts Program in the ordinary course of business consistent with historical practice. The combined Employee contributions and the Debtors' matches are expected to total approximately $185,000 for the Debtors' fiscal year 2016. The Debtors request authority to continue the Matching Gift Program in the ordinary course of business consistent with historical practice and pay any prepetition amounts related thereto.

**3. Adoption Assistance.**

67. The Debtors provide Employees with an adoption assistance program (the "Adoption Program") under which the Debtors will reimburse certain adoption expenses for the adoption of a child, up to an annual maximum of $5,000. The Debtors paid approximately $4,900 and $8,200 for 2015 and 2014, respectively under the Adoption Program. As of the Petition Date, no amounts have accrued under the Adoption Program, although the Debtors request authority to continue the Adoption Program in the ordinary course of business consistent with historical practice.

**4. Relocation Assistance.**

68. The Debtors pay for certain expenses to relocate or provide temporary housing for certain Employees (the "Relocation Program"). Specifically, the Relocation Program provides

Employees with home sale assistance, home finding and temporary living assistance, home purchase assistance, rental assistance, moving and household transportation assistance, and employee and family transition assistance. The Debtors contract with Weichert Relocation Resources Inc. ("Weichert") to administer certain aspects of the Relocation Program. The Debtors believe that maintaining the Relocation Program is important to attracting valuable talent and ensuring smooth transitions into the Debtors' business. The Debtors pay in the aggregate approximately $20,000 per month on account of Employee relocation expenses and associated administrative costs. As of the Petition Date, the Debtors estimate that no amounts have accrued or are unpaid under the Relocation Program.

**5. Employee Referral Program.**

69. The Debtors provide cash incentives to current non-insider Employees who refer candidates to fill identified vacant employment positions in the Debtors' business operations (the "Referral Program"). Under the Referral Program, a referring Employee will receive a payment once a referred candidate has been hired within 30 days of the commencement of their employment with the Debtors. The Debtors believe that this program contributes to the efficient and targeted recruitment of potential new talent for the Debtors, and contributes overall to the Debtors' business. The Debtors pay a total referral payment of up to $3,700 per referred candidate and approximately $16,000 per month in the aggregate on account of the Referral Program. As of the Petition Date, the Debtors estimate that no amounts have accrued or are unpaid under the Referral Program.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

70. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

71. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City*

*of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

72. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

73. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy

Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

74. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use

[s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.”).

75. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors’ ongoing business operations.

76. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors’ businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors’ business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical

element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

77. Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. May 3, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (approved at first day hearing); *In re Energy XXI Ltd*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (approved at first day hearing); *In re Sherwin Alumina Company, LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016); *In re BPZ Res., Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex. Mar. 10, 2015) (approved at first day hearing).[17] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice on a final basis from the outset of these cases.

## III. The Non-Insider Employee Incentive Programs Are Reasonable and a Sound Exercise of Business Judgment.

78. The Debtors further request that they be allowed to continue to honor the Employee Incentive Programs in the ordinary course of business. The Debtors submit that the Employee Incentive Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Employee Incentive Programs are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of the Employee

[17] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Incentive Programs. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012). Although their other two bonus programs are also ordinary course, the Debtors believe that the programs will be reviewed under the section 503(c) construct, and as such do not request approval of those programs in this Motion.

79. The Debtors submit that continuing to maintain the Employee Incentive Programs for non-insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the Employee Incentive Programs are a long-standing component of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize the Employees in the ordinary operations of the Debtors' oil and gas operations. The payments under the Employee Incentive Programs are only attained if an Employee attains certain performance or safety goals. The Debtors therefore believe that it is necessary to continue these programs for non-insiders on a postpetition basis to continue as incentive performance that exceeds expectations. Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue the Employee Incentive Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

## IV. A Limited Waiver of the Automatic Stay for Workers' Compensation Program Is Appropriate in this Case.

80. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

81. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

82. The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be made inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

83. Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

84. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

85. Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the

relief requested by this Motion; I a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

**Notice**

86. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank, N.A., as administrative agent under LINN's prepetition credit facility and Berry's prepetition credit facility, and counsel thereto; (d) The Bank of New York Mellon Trust Company, N.A., as successor indenture trustee for Berry's 6.75% senior unsecured notes due 2020 and 6.375% senior unsecured notes due 2022; (e) counsel to the ad hoc group of holders of Berry's 6.75% senior unsecured notes due 2020 and 6.375% senior unsecured notes due 2022; (f) Delaware Trust Company, as successor indenture trustee for LINN's 12% second lien notes due 2020; (g) counsel to the ad hoc group of LINN 12% second lien notes due 2020; (h) Wilmington Trust Company, as successor indenture trustee for LINN's 6.50% senior unsecured notes due 2019, 6.25% senior unsecured notes due 2019, 8.625% senior unsecured notes due 2020, 7.75% senior unsecured notes due 2021, and 6.5% senior unsecured notes due 2021; (i) counsel to the ad hoc group of holders of LINN's senior unsecured notes; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the Environmental Protection Agency; (m) the office of the attorneys general for the states in which the Debtors operate; (n) the Securities and Exchange Commission; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

87. No prior request for the relief sought in this Motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Victoria, Texas
Dated: May 11, 2016

*/s/ Patricia B. Tomasco*

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
mcavenaugh@jw.com
jwertz@jw.com

-and-

Paul M. Basta, P.C. (*pro hac vice* admission pending)
Stephen E. Hessler, P.C. (*pro hac vice* admission pending)
Brian S. Lennon (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: paul.basta@kirkland.com
stephen.hessler@kirkland.com
brian.lennon@kirkland.com

- and -

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Joseph M. Graham (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
joe.graham@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on May 11, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
One of Counsel