**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| LINN ENERGY, LLC, *et al.*,[1] | ) | Case No. 16-60040 (DRJ) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE AD HOC COMMITTEE OF BERRY SENIOR NOTEHOLDERS
TO THE BERRY DEBTOR'S MOTION TO EXTEND EXCLUSIVITY
[DOCKET NO. 749]**

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number are as follows: Linn Energy, LLC (7591); Berry Petroleum Company, LLC (9387); LinnCo, LLC (6623); Linn Acquisition Company, LLC (4791); Linn Energy Finance Corp. (5453); Linn Energy Holdings, LLC (6517); Linn Exploration & Production Michigan LLC (0738); Linn Exploration Midcontinent, LLC (3143); Linn Midstream, LLC (9707); Linn Midwest Energy LLC (1712); Linn Operating, Inc. (3530); Mid-Continent I, LLC (1812); Mid-Continent II, LLC (1869); Mid-Continent Holdings I, LLC (1686); and Mid-Continent Holdings II, LLC (7129).   The Debtors' principal offices are located at JPMorgan Chase Tower, 600 Travis Street, Suite 5100, Houston, Texas 77002.

The ad hoc committee of Berry senior noteholders (the "Ad Hoc Committee"), consisting of the holders of approximately 80% of the principal face amount of nearly $834 million in 6.75% senior notes due 2020 and 6.375% senior notes due 2022 (collectively, the "Berry Notes") issued by debtor Berry Petroleum Company, LLC ("Berry"), objects to the Debtors' Motion To Extend Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof [Docket No. 749] (the "Exclusivity Motion") *solely as it applies in Berry's chapter 11 case*, and respectfully represents as follows:

## I.    PRELIMINARY STATEMENT[2]

1.    Berry's exclusive period to file a plan will expire on September 8—as it should. The Ad Hoc Committee has attempted to negotiate a plan with the Debtors and Berry's First Lien Lenders, but those efforts have been ignored.   The Ad Hoc Committee would welcome a prompt negotiated solution to Berry's case, but that would require negotiations.   There is no justification for the continued delay of Berry's emergence from chapter 11 as a profitable, stand-alone enterprise, separated from the complexities and significant expense of Linn's chapter 11 cases.   In order for Berry's case to move forward, the Court should permit the Ad Hoc Committee to propose a plan that will allow for Berry to emerge as a going concern, let the other constituents decide whether to support or oppose the plan, and have this Court determine whether the plan satisfies the Bankruptcy Code's requirements for confirmation.

2.    The Ad Hoc Committee presented to Berry and its First Lien Lenders a proposal for a reorganization plan in May.   The detailed term sheet provides for Berry's prompt emergence from chapter 11 as a viable, stand-alone company, the full repayment of the First

---

[2]    Capitalized terms shall have the meaning given to them herein or in the Exclusivity Motion.

Lien Lenders within five years, and, so as to ensure feasibility, new capital contributions by participating Berry bondholders.

3.      Three months later, the Ad Hoc Committee has yet to receive any meaningful response to its proposal from either Berry, Linn, or the First Lien Lenders.   The Debtors' Exclusivity Motion states that "[t]he Debtors are continuing to work with all parties to facilitate a counterproposal from the Berry First Lien Lenders . . . ."   *See* Exclusivity Motion at 3.   There has been little evidence of this.   But even if true, it is clear after three months that the Debtors' efforts to facilitate a counterproposal have failed.   The best way to move the Berry case forward is the procedure contemplated by Congress:   for the Ad Hoc Committee to file a plan and proceed toward confirmation.

4.      Berry's unsecured creditors bear the entire cost of the continued delay.   Berry continues to pay to Linn tens of millions of dollars of Management Fees to subsidize *Linn's* overhead, which Management Fees are forecast to be $73 million in 2016.   Moreover, 30 percent of administrative expenses of the chapter 11 cases (including *Linn's*) are locked and loaded to be allocated to Berry's estate (even though the focus of these proceedings has been Linn, other than the Ad Hoc Committee's attempts to receive accurate reporting about Berry's financial condition).   Berry is forecast to pay $55 million in administrative expenses for 2016.

5.      In contrast, Linn and the First Lien Lenders have little incentive to move quickly. As for Linn, it has admitted that its equity in Berry is worthless.   As for the First Lien Lenders, they are receiving current interest payments, as if Berry were not even in chapter 11. Moreover, if the First Lien Lenders' liens on Berry's assets are valid—as the lenders contend they are—then the lenders are oversecured and will be paid regardless of what happens in this case.   Thus, while it is extremely distressing that the Ad Hoc Committee has not received a

response to its plan proposal after three months, it is not surprising.   Although the First Lien Lenders acknowledge that Berry should emerge expeditiously and separately from Linn, neither Linn nor the First Lien Lenders have any incentive to change the status quo.

6.      The twin legislative goals underlying the 120-day exclusivity period are, one, providing a debtor time to reorganize and, two, protecting creditors' legitimate interests in being repaid what they are owed.   Customarily, the debtor fights for more time in order to reorganize while the creditors push for repayment—even if sometimes that means liquidating the company. This case presents the opposite.   The unsecured creditors have been fighting for Berry to reorganize, while the Debtors are running a protracted marketing process that threatens to break Berry into pieces, destroy the going concern, and in any event locking in unsecured creditor recoveries at the current depressed market values.

7.      The Debtors tout this marketing process as "cause" for extending exclusivity, but it really is cause for ending exclusivity now.   The marketing process was demanded by the First Lien Lenders based upon erroneous projections that Berry was losing money such that a quick sale might be justified to curtail losses.   In reality, Berry has positive EBITDA, which will only improve as Berry is relieved of paying overhead and Management Fees to Linn.   Moreover, the evidence demonstrates that the Berry First Lien Lenders are oversecured (assuming their liens are valid).   The Ad Hoc Committee should be permitted to propose a true restructuring plan—in the spirit of chapter 11—that preserves Berry's business and maximizes value for all constituents.   Creditors and this Court can decide which is the better plan under Bankruptcy Code section 1129(c).

8.      Rubbing salt in the wounds, the Debtors have provided the Ad Hoc Committee with minimal information about the results of their marketing process to date, despite the Ad Hoc

Committee's repeated requests.   The Exclusivity Motion states that "[n]on-binding indications of interest [were] due on August 8, 2016."   *See* Exclusivity Motion at 3.   On August 9, the Ad Hoc Committee requested detailed information about the indications of interest, as paragraph 11(b) of the Final Cash Collateral Order entitles it to: "the Berry Debtors shall provide the following to the . . . ad hoc group of holders of Berry Senior Notes . . . [s]uch other reports and information as the . . . ad hoc group of holders of Berry Senior Notes may reasonably request." Nevertheless, the Ad Hoc Committee still has received only the most general information about the indications of interest:   only that many bids have been received, which bids indicate that value surpasses the First Lien Lenders.   The Ad Hoc Committee has received no specifics and nothing whatsoever that would enable it to assess the likelihood and timing of any (proposed) sale, or how much (if any) value would be received by unsecured creditors after the payment of the First Lien Lenders and administrative expenses.   It is unacceptable that Linn is controlling a sale process when its only stake in Berry is to continue to charge it Management Fees and administrative expenses, while the unsecured creditors—holders of the fulcrum security who have the most at stake—have little meaningful information about that process.

9.     In contrast to some other courts which may appear to grant exclusivity extensions as a matter of course (stifling the adversarial process and its fruits), the Fifth Circuit has made clear that "creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of the enterprise."   *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Inc.)*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988).   As the creditors with the most at risk by Berry's continued stay in chapter 11, the Ad Hoc Committee should be permitted to have a say in Berry's future by proposing a plan.

## II.    BACKGROUND

**A.    BERRY'S ACQUISITION BY LINN AND SEPARATENESS FROM LINN**

10.    Berry was an independent, publicly traded company from 1987 until December 2013.  The Berry Notes were issued in 2010 and 2012—well before Berry was acquired by Linn.  Berry continues to owe approximately $834 million on account of the Berry Notes, in addition to accrued interest and fees.

11.    On December 16, 2013, Linn acquired all of the outstanding common shares of Berry.  Linn Acquisition Company, LLC ("Linn Acquisition"), a direct subsidiary of Linn, was formed then and became Berry's sole member.

12.    Notwithstanding the acquisition, Berry and Linn remained separate companies.[3] Unlike Linn, Berry's capital structure is relatively simple.  Berry is party to a Credit Agreement, dated November 25, 2010 (as amended, the "Credit Agreement") among Berry, as borrower, and Wells Fargo Bank, N.A., as administrative agent (the "Administrative Agent"), and the lenders party thereto (the "First Lien Lenders").  The debt outstanding under the Credit Agreement is putatively secured by most—but not all—of Berry's oil and gas properties. Berry's unsecured debt consists of $834 million of Berry Notes and trade and other general unsecured claims.

13.    Although their capital structures were not combined, Linn stripped Berry of its employees and made them employees of Linn Operating, Inc. ("Linn Operating"), which charges

---

[3]    *See* Testimony of Berry CFO, 7/26/2016 H'g Tr. 43:21-44:15 (concerning "separate company"; "separate corporate entity"; "own Chapter 11 case"; "own assets separate from any of the Linn assets"; "own liabilities separate from any of the Linn liabilities"; "carefully accounted for the separateness since the acquisition in late 2013").

Berry a "Management Fee" for general and administrative services ("<u>Management Fee</u>").[4]   Linn Operating charged Berry Management Fees of approximately $78 million and $86 million for the years ended December 31, 2015, and December 31, 2014, respectively, *id.*,[5] and Linn is continuing to charge tens of millions of dollars in fees during Berry's chapter 11 case.

## B.   LEADING UP TO THE CHAPTER 11 CASES AND THE RSA

14.   Since prior to the Petition Date, the Ad Hoc Committee has worked diligently toward a negotiated restructuring of Berry's capital structure.   On March 9, 2016, the Ad Hoc Committee sent correspondence to the Debtors pointing out that the First Lien Lenders at Berry were "substantially the same entities" as the first liens lenders at Linn.   The Ad Hoc Committee also indicated that certain of its members had taken the necessary steps to "get restricted" and become parties to confidentiality agreements, offering to "constructively, and independently, address any issues that Berry may be facing."

15.   The Ad Hoc Committee's diligence quickly uncovered that the Debtors' projections understated Berry's value and projected EBITDA.[6]   These projections, for example, forecast negative $73.4 million of Adjusted EBITDA for 2016 and flat to negative Adjusted EBITDA for 2017 and 2018.

16.   The material inaccuracies were a result of, among other things, understated production, overstated operating expenses, overly conservative realized prices, the misallocation of Linn's California ad valorem taxes to Berry, and the overstatement of California ad valorem taxes generally.   Prepetition, the Ad Hoc Committee advised the Debtors of these errors before

---

[4]   *See* Berry Form 10-K for the Period Ending 12/31/15 (Mar. 28, 2016) at 84, available at http://ir.linnenergy.com/sec-bp.cfm.

[5]   Linn charged Berry an additional $20 million during the last two weeks of 2013.   *Id.*

[6]   *See* Linn Energy, LLC Form 8-K, dated May 11, 2016, Creditor Diligence Presentation dated April 16, 2016, at 11, available at http://ir.linnenergy.com/sec.cfm?view=all.

the projections were released publicly, but the Debtors inexplicably declined to correct the projections.[7]

17.    Unfortunately, the Debtors' materially inaccurate projections were provided to Berry's First Lien Lenders during the course of their negotiation of a restructuring support agreement with the Debtors (the "RSA").   The First Lien Lenders thus were told that Berry was a significant cash drain, when in fact it is not.

18.    Under the RSA, Berry is to emerge from chapter 11 separately from Linn.[8] However, unlike with respect to Linn, the RSA does not provide for the terms of any "favorable" "take-back" paper at Berry.   Rather, faced with "really bad" projections of significant negative cash flow and negative EBITDA, the First Lien Lenders demanded that the RSA provide for a marketing process for turning Berry's assets into cash.[9]   The marketing process thus was created to solve a problem that did not exist—Berry's erroneously-projected negative cash flow.

C.    THE CHAPTER 11 CASES AND THE PARTIES' RELATIVE POSITIONS THEREIN

19.    The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 11, 2016 (the "Petition Date").   Since the Petition Date, critical facts have come out about the relative positions of the First Lien Lenders, Linn (as Berry's equity holder), and Berry's unsecured creditors.

---

[7]    *See* Testimony of Linn's investment banker, 7/25 H'g Tr. 144:15-22.

[8]    *See* Testimony of Debtors' financial advisor, 7/27 H'g Tr. 16:19-21 ("under the RSAs . . . it does ultimately require a splitting of the company.").

[9]    *See* Testimony of Administrative Agent, 7/28/2016 H'g Tr. 114:13-115:9 ("it was the first lien lenders that requested the marketing process").   The Administrative Agent also testified that the negative projections had a "material bearing" on the First Lien Lenders' request to include a marketing process in the RSA.

### 1. The First Lien Lenders

20.     It has become clear that the First Lien Lenders are oversecured, assuming their liens are valid (as they contend).   Berry has reported $1.457 billion in current unrisked "market value" of oil and gas reserves, versus $671 million in secured debt net of restricted cash.[10]   The First Lien Lenders appear to have a substantial equity cushion.

21.     Moreover, contrary to the Debtors' prepetition projections, Berry has reported positive cash flow, yielding a positive cash flow variance of approximately $50 million relative to the negative forecasts underlying the Cash Collateral Order over just the first 14 weeks of reporting.[11]   Thus, the First Lien Lenders' "restricted" cash is not being depleted to fund Berry's operations.   To the extent any cash is being used up, it is to fund administrative expenses and the continued payment of Management Fees to Linn.

22.     Berry is making adequate protection payments to the First Lien Lenders "in an amount equal to accrued and unpaid prepetition or postpetition interest calculated at the non-default rate."   Final Cash Collateral Order ¶ 10(b).   This description notwithstanding, the interest rate is actually *higher* than what was being paid prepetition.   Berry is also paying the lenders' fees.

---

[10]     *See* Schedules of Assets and Liabilities for Berry Petroleum Company, LLC, filed July 11, 2016 [Docket No. 552] (the "Berry Schedules"), Schedule A/B, Summary of Assets and Liabilities for Non-Individuals.   While the Berry Schedules report approximately $215 million in cash, the latest cash flow reports show approximately $229 million of restricted cash at Berry.

[11]     *See* Variance Report for the Week Ending 6/10/2015; Variance Report for the Week Ending 7/15/2016; Variance Report for the Week Ending 8/19/2016.

### 2.  Linn

23.     Berry's direct parent, Linn Acquisition, has admitted that it believes its equity interest in Berry is worthless.[12]   Thus, Linn has no real economic stake in Berry's case, except to receive fees.   The Debtors project that Berry will pay Management Fees of approximately *$73 million* to Linn Operating in 2016.[13]   Both the Ad Hoc Committee and the First Lien Lenders believe that this amount is excessive.[14]

24.     Moreover, substantial professional fees are being allocated to Berry.   *Stunningly,* the Debtors have recently projected that administrative costs in Berry's chapter 11 case will reach *$48.5 to $55 million for 2016 alone.*[15]   Berry is a source of funding for both Linn's overhead and the overall costs of the Linn/Berry chapter 11 cases.   As an insolvent chapter 11 debtor, this is highly inequitable and inappropriate.

25.     The Debtors and the First Lien Lenders have conceded that Berry has far outperformed the Debtors' prepetition projections and is projected to have positive EBITDA in 2016.[16]   Nevertheless, Linn is currently proceeding with—and in total control of— a marketing process for Berry.   The Debtors have declined to exercise their fiduciary out, instead continuing down the path of a marketing process which was negotiated upon a false predicate.[17]

---

[12]     *See* Schedules of Assets and Liabilities for Linn Acquisition Company, LLC, filed on July 11, 2016 [Docket No. 560] (the "Linn Acquisition Schedules").

[13]     *See* Debtors' 2016 Mid-Year LRP Update, at 16.

[14]     *See* Testimony of Administrative Agent, 7/28/2016 H'g Tr. 117:17-18.

[15]     *See* Debtors' 2016 Mid-Year LRP Update at 16, 31.

[16]     *See* Testimony of Berry CFO, 7/26/2016 H'g Tr. 73:20-74:4; Testimony of Linn's investment banker, 7/25 H'g Tr. 143:20-144:4.

[17]     *See* Testimony of Linn's investment banker, 7/25 H'g Tr. 151:3-6 ("Q:   Notwithstanding the positive projected EBITDA, you're going to continue to market the assets, is that correct? A:   We are going to continue to abide under the RSA until I am told by someone else at the Company to stop that.").

### 3.      Berry Unsecured Creditors

26.      The Berry unsecured creditors are bearing the cost of Berry's chapter 11 case. They are not receiving payments of interest and fees.  They are not receiving the tens of millions of dollars in Management Fees that Linn continues to receive, or the tens of millions more being funded as administrative expenses.  They will not receive any consideration whatsoever until Berry emerges from chapter 11.  Meanwhile, every dollar paid in interest, Management Fees, and administrative expenses is one less dollar the Berry unsecured creditors will receive themselves.

27.      As noted, the First Lien Lenders need not worry if the Debtors' marketing process or chapter 11 case leaves tens—or even hundreds—of millions of dollars on the table.   The First Lien Lenders appear to have a substantial equity cushion and are not at risk of nonpayment. The same cannot be said for Berry's unsecured creditors, who will pay for every dollar lost in the marketing process out of their own recoveries.   The Berry unsecured creditors thus are in every respect the "fulcrum" class in Berry's case.

### D.      THE AD HOC COMMITTEE'S TERM SHEET

28.      Alarmed by the chartered course of Berry's chapter 11 case, the Ad Hoc Committee prepared a proposal for a comprehensive Berry restructuring, and submitted it to the First Lien Lenders and the Debtors around Memorial Day ("Chapter 11 Term Sheet").   The Ad Hoc Committee's proposal included the full repayment of the First Lien Lenders within five years.   It also included a $150-200 million new, junior money investment to ensure the feasibility of any chapter 11 plan.

29.      The Ad Hoc Committee has yet to receive a formal response from either the First Lien Lenders or the Debtors.   The Debtors hosted a single meeting with respect to the Chapter

11 Term Sheet on June 14, 2016, but otherwise there have been no negotiations whatsoever (despite the Ad Hoc Committee's requests).

30.     The only "substantive" input from the Debtors has been their suggestion that a Berry restructuring either must have the consent of the First Lien Lenders or otherwise offer the First Lien Lenders a "net net cash free basis" buy out.[18]   If that is indeed the Debtors' position, then they have effectively abdicated their role as a Berry plan proponent and anointed a "creditor in possession."

31.     Thus, despite the best efforts of the Ad Hoc Committee, Berry's chapter 11 case has not advanced at all, and the Berry unsecured creditors remain held hostage, subject to the massive allocated expense of Linn's overhead and administrative expense.

32.     To their credit, the First Lien Lenders have stated that Berry should emerge as quickly as possible and that it should not be bogged down with the complexities of Linn's chapter 11 case.[19]   The Ad Hoc Committee fully agrees.   But unfortunately, words and actions are not the same thing.

33.     Thus, while Berry's unsecured creditors bear the full cost of Berry's chapter 11 case, the Debtors and First Lien Lenders seem content to maintain the status quo, no matter how many months have passed since the Ad Hoc Committee proposed its Chapter 11 Term Sheet.

---

[18]     *See* Testimony of Linn's investment banker, 7/25 H'g Tr. 150:22-25.

[19]     *See* 5/13/2016 H'g Tr. 44:22-25 ("On the Berry facility we do view that as a separate case, there's no reason that it has to proceed on the same timetable so the sooner it's out the better from our point of view."); *see also* Testimony of Debtors' financial advisor, 7/27 H'g Tr. 52:10-25 (lenders and bondholders are "desirous of a Berry and Linn split").

## III.   OBJECTION

**A.   APPLICABLE STANDARDS AND BURDEN OF PROOF**

34.   The Bankruptcy Code establishes an initial 120-day period during which only a debtor may file a plan.   *See* 11 U.S.C. § 1121(b).   A court may extend this period, but only "for cause."   11 U.S.C. § 1121(d)(1).   It is left to the court to determine whether sufficient "cause" exists to warrant extension of exclusivity.   *See Timbers*, 808 F.2d at 372.

35.   "The law does not favor extensions of the exclusivity period and courts may not routinely grant an extension."   *In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987).   The Fifth Circuit has not enumerated specific elements underlying the analysis, but it has opined that:

> [A]ny bankruptcy court involved in an assessment of whether "cause" exists should be mindful of the legislative goal behind § 1121 [and] avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI.   Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.

*Timbers*, 808 F.2d at 372.   Indeed, only "[a]n *occasional* Chapter 11 debtor, for example, one with a complex debt structure or multifarious business problems, may require more time[;] [h]owever, the existence of such a debtor *is the exception, not the rule*."   *Id.* (emphasis added).

36.   It is the Debtors' burden to establish cause.   *In re Washington-St. Tammany Elec. Coop., Inc.,* 97 B.R. 852, 854 (E.D. La. 1989); *In re New Millennium Mgmt, LLC*, No. 13-35719, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014).   Even where the burden is met, "the Court must also balance potential harm to [other constituents] when determining whether to grant an extension."   *Southwest Oil,* 84 B.R. at 453.

37.   In determining when to extend exclusivity, courts have considered whether "sophisticated and substantial parties who are fully aware of the cost and expense of presenting a

plan of reorganization in a complex chapter 11 proceeding . . . intend to present alternative plans in this proceeding when permitted to do so." *See In re Pub. Serv. Co. of N.H.*, 99 B.R. 155, 175 (Bankr. D.N.H. 1989).[20]   Indeed, the filing of alternative plans might serve as the "only" force to drive the parties toward consensus.   *Id.* at 175 (recognizing that "the *only* recent movement toward an agreement" was spurred by "activity of alternative plan proponents"); *Cf.* 7/28 H'g Tr. 142:24-143:1 (the adversarial process "is what makes our system better than anybody else's, I just think you get there and you get the right results").

38.   A negotiated plan may be the preferred result in some chapter 11 cases.   But that presumes there are negotiations, and that those negotiations can lead to a timely agreement on a plan.   The Bankruptcy Code provides that chapter 11 cases lead to the confirmation of a plan, whether negotiated or not, and if there are divergent views as to what the plan should be, section 1129(c) expressly provides for creditors and the Court to decide which plan is the best.   There is no "cause" for precluding the Ad Hoc Committee from proceeding with its plan.

**B.   THE DEBTORS CANNOT ESTABLISH CAUSE FOR EXTENDING EXCLUSIVITY, AND IN FACT, CAUSE EXISTS *NOT* TO EXTEND EXCLUSIVITY**

**1.   Allowing The Exclusivity Period To Expire Will Allow The Ad Hoc Group To File A Confirmable Plan**

39.   The Ad Hoc Committee's Chapter 11 Term Sheet proposes a reorganization structure for Berry that could, and should, form the basis of a plan of reorganization for Berry. No party has explained why the Chapter 11 Term Sheet does not articulate a confirmable chapter 11 plan.   Nor has the Ad Hoc Committee received a meaningful response from either party; in fact, the Debtors have only held one meeting, over two months ago, to discuss very general terms.

---

[20]   Unsurprisingly, courts also consider "the substantial administrative costs and delay costs being incurred as [] proceedings drag on."   *Id.* at 176.

40.     Although both the Debtors and the First Lien Lenders have offered platitudes about moving Berry's case forward, neither appears able or willing to actually engage in that process.   The Administrative Agent has indicated that the First Lien Lenders are hesitant to respond to the Ad Hoc Committee's proposal due to concerns that any resulting negotiations could constitute a breach of the RSA.   The Debtors, meanwhile, have said virtually nothing about the Ad Hoc Committee's proposal, but seem to be unwilling to proceed down any path that would not cash out the First Lien Lenders on the plan's effective date, regardless of what effect that path may have on unsecured creditors or, more generally, Berry's estate.

41.     Section 1129(b)(2)(A)(i) of the Bankruptcy Code makes clear that secured creditors need not receive cash in satisfaction of their claims.   Instead, provided the secured creditors retain the liens securing their claims, they can receive deferred payments, discounted to present value, that equal the allowed amount of their claims.   *See, e.g.*, *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004); *In re Bastankhah*, 2012 WL 170901, at *3 (Bankr. S.D. Tex. Jan. 18, 2012) (J. Jones); *In re Vasquez*, 2012 WL 3762981, at *2 (Bankr. S.D. Tex. Aug. 29, 2012) (J. Jones). This so-called "take-back paper" generally bears an interest rate that is the sum of the national prime rate or treasury rate plus an upward adjustment to account for risk of nonpayment by the debtor.   *See Till* 541 U.S. at 479.   Therefore, the interest rate on take-back paper will be lower—and thus more feasible—the lower the risk of nonpayment by the reorganized debtor. Among the factors considered in determining the risk rate are: (1) feasibility of the plan; (2) whether the value of the collateral is appreciating, stable, or depreciating; (3) nature of the security being offered to the secured creditor, including the terms of the new paper; (4) commitment of the debtor's owner to the success of its business; (5) how the debtor's revenues have compared to projections in recent months; and (6) quality and extent of the

secured creditors' collateral.   *See, e.g.*, *id.* at 485; *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 334 (5th Cir. 2013); *Vasquez*, 2012 WL 3762981, at *2; *In re LMR, LLC*, 496 B.R. 410, 430 (Bankr. W.D. Tex. 2013) .

42.      The Ad Hoc Committee is not required to prove its entire case for confirmation to simply be allowed to file a plan.   But, it is important to note that there are several facts that make clear that First Lien Lender consent will not be required to confirm a plan, given the overwhelming likelihood that a separate, reorganized Berry will be able to service its restructured debt.

- Pre-existing equity cushion:   Berry reports approximately $1.45 billion in current "estimated market value" of unrisked PV-10 oil and gas reserve value[21] compared to approximately $700 million of net secured debt.[22]

- Stable asset base:   Berry's assets are remarkably "long-life assets," that have a "[l]ow decline rate" and a "reserve life of >18 years," as Linn recognized when approving of the Acquisition.[23]

- Positive recent performance:   Berry's recent performance has been very positive, a fact that has become even more evident since the Debtors have been required to provide additional information about Berry's financial condition to the Ad Hoc Committee.

43.      In addition to the foregoing, the Ad Hoc Committee's constituents are more than committed to Berry's success going forward.   In fact, the Chapter 11 Term Sheet provides for a

---

[21]      As the Court is aware, PV-10 is not the only indicator of market value, but, as the Debtors have conceded, it serves as an independent "benchmark" for market value.   *See* Testimony of Linn's investment banker, 7/25 H'g Tr. 100:7-101:4.

[22]      *See* Berry Schedules, Schedule A/B, Summary of Assets and Liabilities for Non-Individuals.

[23]      *See* Linn Energy, LLC, Form 425, dated February 26, 2013, Merger Overview Presentation, dated February 21, 2014, at 6, available at http://ir.linnenergy.com/sec.cfm.   Linn also identified Berry's significant level of proved reserves and high rate of production as part of its "strategic rationale" as well as the fact that Berry's liquids-focused assets are "high-margin assets with excellent operating margins."   *Id.*

forecast $200 million paydown of the First Lien Lenders' claims, and the Ad Hoc Committee stands willing to invest significant new money—$150 million to $200 million—in the form of equity that would provide substantial *additional* equity cushion to the First Lien Lenders' take-back paper.

44.     At bottom, there is no excuse for the Debtors to hide behind the fact that the First Lien Lenders have not yet consented to a par recovery.   The Ad Hoc Committee believes a consensual resolution with the First Lien Lenders may still be achievable given the shared interests in Berry's prompt emergence.   But that agreement cannot be achieved in the current situation in which only the Debtors may file a plan, the First Lien Lenders have no incentive to negotiate productively with the Ad Hoc Committee, and no real progress toward confirmation is being made.   The right to file a plan is an important tool, but the tool currently rests in the Debtors' tool belt and is not being used.   The time has come to permit the Ad Hoc Committee to pick up the tool and start working toward a prompt resolution of Berry's chapter 11 case.

### 2.     Unnecessarily Allowing Berry To Linger In Bankruptcy Is Value Destructive, And It Is Solely Unsecured Creditors' Skin In The Game

45.     Given the Debtors' own current estimates of Berry's value, it is Berry's unsecured creditors alone (*i.e.*, the constituents represented by the Ad Hoc Committee), *not Berry's equity owner Linn nor the First Lien Lenders*, who ultimately are shouldering the costs of Berry's stay in chapter 11 (including the subsidization of Linn's own chapter 11 case).   This fundamental, and yet simple, value dynamic likely explains the lack of urgency with which the Debtors are working to reorganize Berry, instead focusing on the thorny issues raised by Linn's more complex capital structure and negative business results.

46.     At the final hearing on the Debtors' cash collateral and cash management motions (the "Final Hearing"), Debtors' counsel admonished Linn's unsecured creditors to act like the

future owners of Linn: "when this creditor group … act[s] like the owners of this business, which the economics dictate that they are, then we're going to stop bickering about this and start working on how to maximize value."[24]   No similar admonishment was warranted at Berry. Since well before the commencement of Berry's chapter 11 case, the Ad Hoc Committee has been doing all it can to advance Berry's restructuring.

47.    The bill for Berry's chapter 11 case threatens to be stunningly exorbitant.   The administrative expense burn has been remarkably high.   In fact, the Debtors forecast that Berry will be responsible for approximately *$48.5-$55 million* in reorganization-related expenses in 2016 alone.[25]   Moreover, as discussed above, the longer Berry remains in these chapter 11 cases—and affiliated with Linn—the more Linn will charge Management Fees; currently, Linn is threatening to charge approximately *$73 million* this year alone.[26]   The Ad Hoc Committee has thus far reserved rights.   It has been the Ad Hoc Committee's view, to date, that it makes more sense to prosecute Berry's emergence rather than litigate for a more comfortable stay in chapter 11.   Extending exclusivity will upend this analysis.

48.    Berry has been neglected.   There is no better witness to the Final Hearing than the Court.   And yet even a casual listener would observe that the Debtors and the First Lien Lenders (who largely overlap between Berry's and Linn's secured credit facilities) are diverting most of their time and energy to litigating exclusively Linn-related issues (*e.g.,* putatively unencumbered cash, secured or unsecured nature of hedge proceeds, "second lien" debt, the terms of "favorable" take back paper).

49.    Additional harms are imposed upon Berry in chapter 11.   Among other things:

---

[24]    *See* 7/25/2016 H'g Tr. 39:7-10.

[25]    *See* Debtors' 2016 Mid-Year LRP Update at 16, 31.

[26]    *See id.* at 16.

- Berry has been double-charged by Linn for ad valorem taxes.[27]

- Cash is withheld by Linn on account of Berry's ad valorem taxes for extended periods of time before any such amounts are potentially required to be paid to taxing authorities.   Moreover, this accrual treatment gives rise to significant risk that cash deposits in excess of any tax liabilities or payments are retained by Linn. The Ad Hoc Committee believes that this may be an issue to the extent of tens of millions of dollars, and the Debtors have yet to satisfy months-old requests from the Ad Hoc Committee (as well as the advisors to the Independent Manager) for information that proves otherwise.

- Cash is withheld by Linn on account of pre- and post-petition expenses that will not be paid in full or at all.

- All of Berry's cash receipts are commingled with Linn's, despite being able to identify the vast majority of receipts related to Berry.[28]

- Berry is subject to *at least* a one month lag when it comes to actual cash receipts.[29]

- Berry is subject to accrual entries for intercompany charges that are "not lined up with cash" and the Debtors have yet to satisfy their obligation under the Cash Management Order to provide the Ad Hoc Committee with a year-to-date reconciliation of such intercompany charges.[30]

- There are no internal controls in place to ensure Linn does not charge Berry for expenses that Linn does not itself pay.[31]

- Berry's gross or net proceeds attributable to its oil and gas reserves are not reported.[32]

---

[27]   *See* Testimony of Berry CFO, 7/26/2016 H'g Tr. 75:10-20 (Linn double charged Berry for California ad valorem taxes through intercompany true-up process); Testimony of Debtors' financial advisor, 7/27 H'g Tr. 71:17-21 (Berry paid twice for something it should have only paid once for).

[28]   *See* Testimony of Debtors' financial advisor, 7/27 H'g Tr. 13:20-24; 16:13-15 ("all the funds from customers are received into one set of lockboxes").

[29]   *Id*. at. 67:18-68:9 ("The actual is a month late.").

[30]   *Id.* at 69:18-21.

[31]   *Id.* at 70:23-25.

[32]   *See* Testimony of Berry's CFO, 7/26/2016 H'g Tr. 52:6-19.

50.     Given the lack of any real economic interest in Berry, Linn is actually incentivized to *keep* Berry affiliated with it in bankruptcy, for as long as that remains the case, Linn will attempt to charge Management Fees and allocate professional fees to Berry, and may be able to forestall adverse (Linn) tax consequences of a separation.

51.     For their part, the First Lien Lenders, while having expressed a desire to see Berry emerge separately from Linn and on a shorter timetable,[33] are ultimately not the ones who will have to pay the expenses that are being incurred during the pendency of Berry's bankruptcy. This is because the First Lien Lenders are likely oversecured, as the $1.6 billion in real property assets and cash listed in Berry's Schedules eclipses the reported $700 million in net secured debt, even taking into account that the First Lien Lenders do not have perfected liens on all of Berry's assets.[34]

52.     It is up to the Ad Hoc Committee to formulate a confirmable reorganization structure as the Chapter 11 Term Sheet seeks to do.   Otherwise, unnecessary costs will continue to accrue, and Berry's value will be diminished.   Potential litigation over plan confirmation will be replaced with litigation over Management Fees and administrative expenses.   Therefore, the Exclusivity Motion should be denied as to Berry, and the Ad Hoc Committee should be afforded the opportunity to advance its Chapter 11 Term Sheet so that Berry can preserve its value and emerge from bankruptcy.

### 3.      Berry's Chapter 11 Case Is On The Wrong Track

53.     Just as alarming as the lack of progress towards reorganization, Berry's chapter 11 case is proceeding down a nonsensical path chosen based upon a false predicate.   As

---

[33]   *See* 5/13/2016 H'g Tr. 44:22-25.

[34]   *See* Berry Schedules, Summary of Assets and Liabilities for Non-Individuals; Schedule A/B.   Moreover, while the Berry Schedules show approximately $215 cash on hand, latest cash flow reports show approximately $229 million of cash at Berry.

discussed above, the Debtors' prepetition projections erroneously showed that Berry was cash flow negative.   Indeed, the Debtors and the First Lien Lenders negotiated the RSA, and entered this chapter 11 case, under the mistaken belief that there "was *no doubt*" that Berry was cash flow negative, thus possibly justifying a quick sale to minimize further losses.[35]

54.   Based on these materially inaccurate projections (which caused the Debtors to represent incorrectly to their creditors that Berry needed *a $500 million* cash infusion), the First Lien Lenders required the RSA to include a marketing process.[36]   The Ad Hoc Committee has never agreed with the Debtors' negative projections for Berry, and immediately began to point out its findings.   Reality has proven the Ad Hoc Committee to be correct.   According to the variance for weeks 5 and 10 and 14 (the only three reports that have included the necessary information), as of August 19, 2016, there has been an approximate $50 million positive variance to the 13-week cash flow projected as of the Petition Date.[37]

55.   The Debtors have acknowledged their error, but have not re-routed their path. The Debtors' financial advisor testified at the Final Hearing that Berry's performance has been materially better than the projections anticipated, and indicated that the Debtors would revise their projections accordingly.   Indeed, the Debtors are now projecting positive EBITDA for Berry in 2016 and beyond.[38]

---

[35]   *See* Testimony of Debtors' financial advisor, 7/27 H'g Tr. 56:16-57:6 ("Based on the business plan, based on the cash flows that I had available to me that was – that's how I made that foundation [that there was no doubt in my mind that Berry was cash flow negative]").

[36]   *See* Testimony of Administrative Agent, 7/28/2016 H'g Tr. 114:22-115:1.

[37]   *See* Variance Report for the Week Ending 6/10/2015; Variance Report for the Week Ending 7/15/2016; Variance Report for the Week Ending 8/19/2016.

[38]   *See* Debtors' 2016 Mid-Year Update; Testimony of Berry's CFO 7/26/2016 H'g Tr. 73:14-19 (Q. "…it's true, Mr. Rottino, that Linn currently projects positive EBIDTA for Berry for 2016 and beyond, is it not?"   A.   "We're finishing our updated forecast, but, yes, at current prices the initial pass that I have seen, yes, there is positive EBIDTA.").

56.     The Debtors have also acknowledged the fundamental truth that reorganizing Berry as a going concern is value maximizing relative to a liquidation.[39]    And, in the context of Berry's chapter 11 case, it is difficult to conceive of a sound business reason for a sale of Berry's assets.   *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("for the debtor-in-possession . . . to satisfy its fiduciary duty to . . . creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009) (although sale of substantially all assets not "*per se* prohibited," they are "subject to special scrutiny").

57.     Nevertheless, the Debtors are proceeding down the exact same path they were when they believed that Berry was suffering from significant negative EBITDA, refusing to focus on reorganization and pointing to the RSA as impetus for the marketing process.[40]    At the Final Hearing, the Debtors' financial advisor testified that the Debtors "have an RSA that [they] like,"[41] implicitly signaling that it is the take-back paper *at Linn* that is primarily responsible for the fact that Berry assets are being marketed, including on a piecemeal basis.   In essence, Berry and Linn have entered into a deal with the First Lien Lenders in which Linn benefits and Berry is put at risk.   The interests of Berry and its unsecured creditors are being sacrificed so the Linn Debtors can continue to receive the benefits of the RSA.

---

[39]    *See* Testimony of Berry's CFO, 7/26/2016 Hr'g Tr. 72:6-9 (Q.   "You do agree with me, Mr. Rottino, do you not, that reorganizing as a going concern, as a general matter, is preferable to a liquidation in bankruptcy, correct?"   A.   "I would agree with that.").

[40]    *See* Testimony of Linn's investment banker, 7/25/2016 Hr'g Tr. 150:3-5; 151:5-6.   The Debtors' financial advisor, Mr. Fordyce, testified that "We are abiding by the terms of the RSA . . . . .   We are going to continue to abide under the RSA until I am told by someone else at the Company to stop that."

[41]    *See* Testimony of Linn's investment banker, 7/25/2016 H'g Tr. 150:8.

58.     Rubbing salt in the Ad Hoc Committee's wounds, the Debtors have refused to provide meaningful reporting to the Ad Hoc Committee with respect to the marketing process. This is indefensible.   The marketing process is the *first* reason cited in the Debtors' Exclusivity Motion as to why exclusivity should be extended as to Berry.   Yet, the Debtors not only have ignored the Ad Hoc Committee's concerns generally about the marketing process, they have also refused to provide the Ad Hoc Committee with meaningful information about its results to date.

59.     Berry's three largest stakeholders are Linn, the First Lien Lenders, and the Ad Hoc Committee.   Each has a right to know about the threatened disposition of Berry's assets. Indeed, under section 11(b)(viii) of the Final Cash Collateral Order, Berry is required to provide "[s]uch other reports and information as the . . . ad hoc group of holders of Berry Senior Notes may reasonably request."

60.     The only excuse that the Debtors have suggested for not providing information to the Ad Hoc Committee is that its members and other unsecured creditors may become the owners of Berry under the Chapter 11 Term Sheet.   But that prepetition creditors may end up equitizing their claims under a plan is no justification for withholding information from them. Indeed, under the RSA, the First Lien Lenders reserved their right "to credit bid under any sale or Plan," and thus also could end up owning Berry.   Moreover, Linn has not disavowed any intent to bid on Berry's assets, and discovery has shown that it explored various ways to retain Berry (including pursuant to a "new value" plan).   Thus, there is no basis to withhold information about the marketing process from Berry's unsecured creditors, when Linn not only has full information, but in fact is controlling the entire process.

61.     Rather than a justification for the extension of exclusivity, the marketing process, run by an entity with no legitimate interest in its outcome other than extending its duration, is another reason why exclusivity should not be extended.

**C.     BERRY WILL NOT BE PREJUDCED BECAUSE IT WILL RETAIN ITS RIGHT TO FILE A PLAN**

62.     Allowing Berry's exclusivity period to end will not prejudice the Debtors or prevent them from filing their own plan.   *See, e.g.*, *Southwest Oil*, 84 B.R. at 454 ("By denying the extension, the Court does not prejudice the debtors' co-existent right, nor dilute the debtors' duty to file a plan.   The other parties are simply allowed to protect their interests by coming forward with alternative plans . . . ."); *In re R.G. Pharmacy, Inc.*, 374 B.R 484, 488 (Bankr. D. Conn. 2007) (denying motion to extend exclusivity "only affords creditors their right to file a plan; there is no negative effect upon the debtor's coexisting right") (internal quotations omitted).

63.     There is every reason to terminate exclusivity and no reason to extend it.   The Ad Hoc Committee's constituents, whose money is invested in Berry and will be the most affected by the outcome of Berry's chapter 11 case, "have a right to a say in the future of that enterprise."   *Timbers*, 808 F.2d at 372.

## IV.     CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court deny the Exclusivity Motion as to Berry and grant such other and further relief as the Court deems just and proper.

DATED:   August 22, 2016

*/s/ William Greendyke*
William Greendyke
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:   (713) 651-5193
Facsimile:   (713) 651-5246

Susheel Kirpalani (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

K. John Shaffer (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

David Gerger
Emily Smith (Texas Bar No. 24083876)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana St., Suite 500
Houston, Texas 77002
Telephone:   (713) 221-7000
Facsimile:   (713) 221-7100

*Counsel to the Ad Hoc Group of Berry
Noteholders*
